SUTTON, et ux. *v.* HAYES, et al.

No. 39896 March 26, 1956 86 So. 2d 337

*North & North,* Belzoni; *Barnett, Jones & Montgomery,* Jackson, for appellants.

*Beverly C. Adams,* New Orleans, Louisiana; *G. H. Mc-Morrough, P. P. Lindholm,* Lexington; *King & King,* Durant, for appellees.

McGehee, C. J.

The principal assignment of error on this appeal is that the finding of fact by the chancellor when he held

that a deed of conveyance executed by the appellants, Theolar Sutton and wife, Josiephine Sutton, on February 5, 1952, in favor of Bishop Hayes, was not procured by fraud, and is a valid instrument, it being the contention of appellants that such finding of fact is against the overwhelming weight of the evidence. There was an additional assignment of error to the effect that the chancellor erred in refusing to admit the testimony of one D. C. Conn, the latter being filed subsequent to the filing of appellants' original brief and the brief on behalf of the appellees. A motion to strike the amended assignment of error was passed for consideration by the Court until the decision of the appeal on its merits.

It appears that on January 1, 1944, the appellant, Theolar Sutton, purchased the 63 acres of land in question from the United States Government at and for the purchase price of $5,700. In November 1951 the said appellant was in arrears on his payment of the purchase price of the land to the extent of approximately $1,500, because of his failure each year to pay the annual installment in full. In other words, after taking into consideration any payments on principal and interest that may have been made, the grantee, Theolar Sutton, still owed in 1951 as much as the original indebtedness of $5,700 on the land.

There was testimony given by certain officials connected with the Farm Credit Administration or other governmental agencies, in regard to Theolar Sutton being pressed in November 1951 for the payment of the amount then in arrears on the land; that during the fall of 1951 Theolar Sutton had negotiated with one Henry Wilson for the renting of the land to him for the years, 1952, 1953, and 1954, with the right of the lessor and his wife to remain on the land and make a share crop during each of those years. It was thought that the proceeds from the share crop, together with the rent that Wilson would owe to Sutton, would be suf-

ficient to enable Sutton to catch up with his indebtedness to the United States in the fall of 1952 when the crops were harvested and sold. It is contended that Wilson had agreed that if the proceeds of the crops were not sufficient to pay off the $1,500 then in arrears, Wilson would lend the Suttons the balance necessary to make their loan current; that Wilson was unable to make his contemplated arrangement with the Merchants and Farmers Bank of Tchula for the borrowing of money sufficient to carry on the farming operation; that this proposed rental arrangement was mentioned to Mr. Strider and Mr. Dillion one night at the home of Theolar Sutton at a time when the appellee, Ralthus Hayes, was present; and that on that occasion the question was raised about the necessity of Henry Wilson going into debt to operate the farm, whereas Ralthus Hayes would not have to do so in order to handle the transaction. Mr. Strider and Mr. Dillion had some connection with one of the governmental agencies interested in getting the loan current.

Henry Wilson testified that on the occasion above mentioned he outlined to Ralthus Hayes what plan should be worked out for farming the land, but explained that he had been unable to get the money for that purpose, and thereupon Ralthus Hayes said: ''Well, that being the case, I will do the same thing,'' meaning that he would rent the land from Theolar Sutton on the same terms and conditions that had been proposed by Henry Wilson.

Ralthus Hayes and Theolar Sutton had entered into a written contract on November 15, 1951, whereby Ralthus Hayes was to rent the land, pay one-fourth of the cotton grown during the years 1952, 1953, and 1954, and also pay as rent a certain portion of the corn and beans grown thereon, but permitting the Suttons to remain on the land and make a share crop, for the making of which crop Hayes was to furnish the Suttons money and supplies. The testimony is conflicting as to whether

this rental agreement between Ralthus Hayes and the Suttons ever went into effect, it being contended by Ralthus Hayes that during the early part of the year 1952, the Suttons had decided to sell the land and become sharecroppers thereon; that pursuant to his understanding of Theolar Sutton's desire to sell, the said Ralthus Hayes agreed to buy the land for his brother, Bishop Hayes, who had been employed by the railroad company for many years and who wanted to buy a farm in the government project where this land was located.

Josiephine Sutton testified that on February 5, 1952, while she was confined at home with a baby two weeks old, the appellee Ralthus Hayes came to her home and told her he had "a rent waiver" for her and Theolar Sutton to sign in order that Ralthus Hayes might be able to borrow money with which to furnish the Suttons money and supplies during that year; that Ralthus Hayes had previously been to the home and borrowed Theolar Sutton's deed in order that he might show the description of the land and number of acres in cultivation, etc., in order to arrange for the money and supplies for the Suttons; and that on the occasion of her signing what she supposed to be the rent waiver, but which turned out to be a deed in favor of Bishop Hayes, the said Ralthus Hayes inquired as to where Theolar Sutton was, and that she told him that Theolar had gone to Byrd's store, and that Ralthus left with the instrument that she had signed and stated that he was going down to Byrd's store and see Theolar and get him to sign.

Theolar Sutton testified that Ralthus Hayes had previously come to the home of Theolar Sutton and wife when they were both present, and had borrowed his deed under the same circumstances testified to by Josiephine; that on February 5, 1952, the said Ralthus Hayes came to Byrd's store in his car and asked the witness, Theolar Sutton, to sign a rent waiver which turned out to be the deed of conveyance from the Suttons to Bishop Hayes;

and that he had confidence in Ralthus Hayes and believed that he was signing the rent waiver at the time he signed the deed of conveyance in question.

One Amos McCarrum testified on behalf of the appellants that he was at Byrd's store when Ralthus Hayes came there in his car, and that he heard Hayes tell Theolar Sutton that he had a rent waiver for Sutton to sign; that the paper was placed on the fender of the car and that Hayes was doing some writing three or four minutes before Theolar Sutton signed the paper.

It developed, however, that the deed of conveyance was fully typewritten, from beginning to end, except for the signatures of Theolar Sutton and Josiephine Sutton and that of J. L. Shields, a notary public before whom the instrument was purportedly acknowledged. The instrument recited a consideration of one dollar and the assumption by the grantee, Bishop Hayes, of the indebtedness owing to the United States government on the land. And it further appears from the testimony on behalf of the appellees that Bishop Hayes, upon learning that he could not carry out his plan for paying the United States government for the land unless he should reside thereon, conveyed the same to Ralthus Hayes during the fall of 1952, and Ralthus Hayes assumed the payment of the indebtedness to the United States government and then paid the same in full, amounting to $5,782.47, from the proceeds of a loan that he obtained from the Federal Land Bank of New Orleans in the sum of $2,200 and the remainder from his own personal funds.

It appears that no rent for the year 1952 was paid to the Suttons by Ralthus Hayes, and this was evidently upon the theory that the land had been conveyed by the Suttons to Bishop Hayes on February 5, 1952. Due to the successful operation of the farm during that year, it developed that the amount of the rent that would have been due the Suttons under the rental agreement from Ralthus Hayes of November 15, 1951 plus one-half

of the share crop made by the Suttons, would have been ample to have paid up the amount in arrears during the fall of 1952. However, none of the parties could foresee on February 5, 1952 that the farming operations during that year would be so successful.

Ralthus Hayes testified that after he learned during the early part of the year 1952 that Theolar Sutton wanted to sell the land, and that since he, the witness, knew that Bishop Hayes wanted to buy a farm in that government project, he went to the home of Theolar Sutton, when both he and Josiephine were present, and borrowed his deed for the purpose of getting an attorney to draw a deed from the Suttons to Bishop Hayes; that he, Ralthus Hayes, had the deed prepared on February 4, 1952 by an attorney; that he read the instrument to the Suttons after it had been prepared and left it with them over night and then returned on February 5, 1952; and that Josiephine Sutton signed the instrument at their home, and that he then carried it to Theolar Sutton at Byrd's store, and that Theolar went with him in his car to the town of Tchula where he signed and acknowledged the deed before Mr. Shields, the notary public. There is no contention that Josiephine Sutton ever acknowledged the deed before the notary public. Theolar Sutton, who was corroborated by at least one witness, testified that he did not leave Byrd's store with Ralthus Hayes, but that he signed the instrument on the fender of the car there, and then went home in the car with Tom Rogers, who lives in St. Louis and did not testify at the trial, and with Lynn Sutton, his father, who was mentally and physically unable to give any testimony of any probative value at the trial.

As to the testimony of Amos McCarrum, it was for the consideration of the chancellor as to whether or not Ralthus Hayes, who had obtained a deed from Josiephine Sutton at the Sutton's home, would have announced in the hearing of Amos that he had a rent waiver for Theolar to sign when he called him to the car. That would

have been at variance with the terms of the instrument actually signed by Josiephine and Theolar Sutton on which he intended to rely as a warranty deed to Bishop Hayes for the land.

Other witnesses testified in regard to Theolar Sutton having stated in their presence, in substance, that he had sold to or let Bishop Hayes have his unit in the project, and was there as a sharecropper. It is unnecessary to quote this testimony in detail as it appears that even though his statements to these several persons after the execution of the deed of conveyance may have been subject to some other interpretation than that he had knowingly conveyed the land by deed to Bishop Hayes, the fact remains that there was a clear cut issue of fact for the decision of the chancellor on the conflicting evidence as to whether or not the deed had been fraudulently obtained. Had the chancellor decided this issue in favor of the appellants on the conflicting evidence before him, we would not feel warranted in disturbing his finding of fact in that behalf. Nor do we feel justified after a careful reading of this three-volume record now before us in holding that the chancellor was manifestly wrong in deciding the issue in favor of the appellees. He had an opportunity to observe the witnesses, to note their demeanor on the stand, and to determine whom he would believe, where the testimony was directly in conflict, not only as to whether the deed was left with the Suttons over night on the day it was prepared, but also as to whether or not Ralthus Hayes represented to the grantors that it was a rent waiver.

There was also testimony on behalf of the appellants that they were not confronted with an immediate foreclosure of the United States government's deed of trust in view of the willingness of other parties to have rented the land during 1952 and to allow the appellants to make a share crop thereon in the hope that the rent and half of the share crop would have been sufficient to have paid the amount of the indebtedness in arrears, and that

otherwise such other person or persons were willing to have paid the difference for the Suttons if the crops had been insufficient for that purpose. And it is to be conceded that the deed of trust of the United States government was never foreclosed but was finally paid off in full by the appellee, Ralthus Hayes, in the manner hereinbefore stated during the fall of 1952. █ Nevertheless, the chancellor concluded on conflicting testimony that instead of appellants availing themselves of any of the other offers, they actually deeded the land on February 5, 1952 to Bishop Hayes, and that the deed was not obtained by fraud.

 On the second assignment of error the Court is of the opinion that even if Mr. Conn had been permitted to testify what the appellants offered to prove by him, it could still not be said with an abiding confidence that the finding of fact by the chancellor on the issue of whether or not the deed was fraudulently obtained, is manifestly wrong. There is some diversity of opinion among the judges as to whether or not the decision of the trial court on the controlling issue of fact is supported by a preponderance of the evidence, but none of us feel that we would be justified in saying that the chancellor was manifestly wrong on that issue.

The decree appealed from must therefore be affirmed.

Affirmed.

*Lee, Holmes, Arrington,* and *Ethridge, JJ.,* concur